UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| AIG SPECIALTY INSURANCE COMPANY | CIVIL ACTION NO. 2:22-cv-05410-EEF-DPC |
| v. | JUDGE ELDON E. FALLON |
| JAMES AGEE, ET AL | MAGISTRATE JUDGE DONNA PHILLIPS CURRAULT |

## ORDER & REASONS

Before the Court are two motions for summary judgment, one urged by Plaintiff AIG Specialty Insurance Company, and one urged by Defendants James Agee and Shea Harrelson. After reviewing the motions, memoranda, applicable law, and the parties' oral argument on the motions, the Court now rules as follows.

### I. BACKGROUND

Plaintiff AIG Specialty Insurance Company ("AIG") brought this action against Defendants James Agee ("Agee") and Shea Harrelson ("Harrelson") (collectively, "Defendants") seeking declaratory judgment from the Court that it is has no duty or obligation to pay out a judgment obtained by Defendants in state court against UTC Laboratories, Defendants' former employer, which was insured by AIG. R. Doc. 1 at 2-3. AIG alleges that it was not properly noticed by UTC about Defendants' state court claim as was required under the insurance policy between itself and UTC. *Id.* at 5-6. As per AIG, the policy required that any claim made against UTC, the insured, must be reported to AIG during the covered policy period or within ninety days after the expiration of the policy period and neither of which occurred. *Id.* at 9-11.

a. **State Court Judgment**

1

This case stems from an employment dispute among Defendants Agee and Harrelson and their former employer, UTC Laboratories LLC. Defendants both began working for UTC Labs on July 1, 2014 as Area Vice Presidents with identical employment contracts. First Federal Complaint, R. Doc. 1-2 at 2. Their employment contracts set forth that they were to be paid base salaries of $10,000 per month, monthly commissions, and quarterly bonuses. *Id.* at 3. Defendants were paid accordingly until November 2014 when UTC only paid them their monthly base salaries. *Id.* In December 2014, the Centers for Medicare and Medicaid Services (CMS), a primary source of business for UTC, "suspended funding to UTC pending a review of its practices." *Id.* In April 2015, UTC terminated both Defendants' employment and Defendants have alleged that beginning on April 18, 2015 they "made repeated demands for payments for all of these commissions." State Lawsuit Stipulations of Fact, R. Doc. 66-5 at 3.[1]

Defendants, Agee and Harrelson, ultimately brought suit against UTC in the Eastern District of Louisiana in May 2017 for the "earned compensation, bonuses, commissions, paid time off, other fringe benefits, and severance" that they never received. First Federal Complaint, R. Doc. 1-2 at 3; *see Agee et al v. UTC Laboratories, LLC*, 2:17-cv-04755-JTM-KWR. In that suit, Agee and Harrelson alleged UTC violated the Louisiana Wage Payment Act and asserted a breach of contract claim under their employment agreements. R. Doc. 1-2 at 4-5.

That federal suit was dismissed without prejudice in early 2018 because the parties no longer maintained diversity, however in October 2017, Agee and Harrelson had also filed a state lawsuit against UTC in the 24th Judicial District Court of Jefferson Parish, Louisiana. *See* State Court Complaint, R. Doc. 1-3. AIG was not a party to either the first federal lawsuit or the state

---

[1] AIG references this date as "April 8, 2015" in its memorandum in support of its motion, *see* R. Doc. 66-1 at 12, 13. However, in Agee and Harrelson's state suit stipulation attached to this motion, R. Doc. 66-5, Agee and Harrelson indicate the date as "April 18, 2015." This discrepancy does not impact the legal analysis and the Court will refer to April 18, 2015 for consistency.

2

lawsuit. AIG participated in the trial and provided representation to their insured. R. Doc. 1 at 7.[2] The state suit proceeded to trial in October 2022 and on December 19, 2022, the State Court District Judge signed a judgment in favor of Agee and Harrelson and against UTC, awarding Agee $1,110,373.34 and awarding Harrelson $2,125,537.35. State Judgment, R. Doc. 1-5.

In status conferences, the parties have informed this Court that the underlying state court judgment is currently on appeal before the Court of Appeal of Louisiana, Fifth Circuit as to quantum, however UTC is now defunct and is not participating in the appeal, so parties remain unsure of how this appeal will proceed. The Louisiana Fifth Circuit heard oral argument on this appeal on October 10, 2023.

    b. **The Case at Bar**

AIG seeks declaratory judgment that it need not pay Agee and Harrelson's state court judgment, asserting: (1) failure of notice; (2) no duty or obligation under any policy to indemnify, pay, or reimburse UTC and/or other claimants with respect to the state court judgment; and (3) limitations and exclusions under the policies. Complaint, R. Doc. 1. at 9-13.

From 2015 – 2020, AIG was UTC's insurer under three policies: one that spanned March 31, 2015 – March 31, 2017; one that spanned March 31, 2017 – March 31, 2018; and one that spanned March 31, 2018 – March 31, 2020. R. Doc. 66-1 at 3-4. Following the termination of their employment in April 2015, Agee and Harrelson maintain they demanded their payment from April 18, 2015 onward. AIG avers that the first time UTC, the insured, gave AIG notice of such claim was on September 19, 2017 and that this email notice made a claim under the 2017-2018 insurance

---

[2] Defendants aver that AIG was involved in the state lawsuit even if it was not a named party, for example by paying fees to attorneys representing UTC and other defendants that Agee and Harrelson have since settled with, showing their "specific knowledge regarding UTC's viability as a going concern throughout the state court litigation." R. Doc. 7 at ¶ 54.

3

policy.[3] *See* Complaint, R. Doc. 1 at 5; Email Exhibit, R. Doc. 1-1. AIG alleges failure to provide notice because under the policies, UTC was required to give notice of a claim during the policy or within 90 days of its conclusion, and "September [19], 2017 is not a date within the March 31, 2015 through March 31, 2017 Policy Period" during which Agee and Harrelson's claims arose. Complaint, R. Doc. 1 at 5-6.

Defendants Agee and Harrelson generally deny AIG's allegations and assert a number of affirmative defenses, including: (1) claims are barred by the doctrine of estoppel, waiver, or unclean hands; (2) AIG suffered no prejudice as a result of any alleged failure of notice; (3) no policy expressly states that coverage would not be afforded if prompt notice was not provided; (4) limitations and exclusions under the Policy must be strictly construed in favor of coverage; (5) Defendants are the victims of actual or constructive wrongful termination, breach of implied contracts, and employment-related misrepresentations; and (6) failure to state a claim. Answer and Counterclaim, R. Doc. 7 at 5-8.

Agee and Harrelson also asserted a counterclaim against AIG for the state court judgment. *Id.* at 8-12. This counterclaim contains three counts: (1) that the Directors and Officers Liability (D&O) Policies indemnify directors and officers from liability resulting from state court judgments and thus AIG is liable to UTC and to Defendants; (2) the Employment Practices Liability (EPL) Policies include in their definition of loss "salary, wages, or bonus compensation" which form the basis of the state court judgment stemming from employment practices violations, and thus AIG is liable to UTC and thus to Defendants; and (3) the policies require AIG to "not unreasonably withhold its consent from settlement" and Defendants allege AIG repeatedly withheld consent to

---

[3] AIG in its Complaint, R. Doc. 1, describes this email as being dated "September 17, 2017" however the email attached as R. Doc. 1-1 is dated "September 19, 2017." This discrepancy does not impact the legal analysis and the Court will refer to the date as September 19, 2017 for consistency.

reasonable offers. *Id.* at 9-12. AIG filed a motion to dismiss Defendants' counterclaim and on August 30, 2023, the Court heard oral argument on AIG's motion. *See* R. Doc. 91. The Court denied the motion, finding that Defendants sufficiently pleaded a plausible claim for relief. *Id.*

## II.     PRESENT MOTIONS

Defendants and AIG have each filed a motion for summary judgment in this matter. Defendants' motion urges the Court to dismiss AIG's declaratory judgment action and grant Defendants' counterclaim, entitling them to recover from AIG the amounts set forth in the state court judgment. R. Doc. 115. Defendants present four arguments in support of their motion: (1) the 2017-2018 insurance policy covers their claims; (2) the 2017-2018 policy's Employment Practices Liability Section (EPL) covers their claims; (3) the 2017-2018 policy's Directors, Officers and Private Company Liability Insurance Section (D&O) covers their claims; and (4) AIG cannot assert untimely notice of their claims because of estoppel, waiver, and/or unclean hands. R. Doc. 115-1 at 1-2. While there are several insurance policies that span the dispute, Defendants argue that the 2017-2018 policy applies because they argue the claim first arose and was first reported to AIG during that policy period. *Id.* at 5-8. Defendants point to the policy's definition of "claim," which includes "any civil, criminal, administrative or regulatory proceeding . . . which is commenced by . . . service of a complaint." *Id.* at 6 (quoting the policy, R. Doc. 115-5 at 18). Thus, they argue that their federal complaint filed May 6, 2017, and which was reported to AIG in September 2017, satisfies the notice requirement.

Defendants object to AIG's argument that this September 2017 notice was untimely for several reasons: (1) the definitions of "claim" in the policy are "disjunctive," and the claim that arose from the lawsuit did not exist in 2015 when Defendants emailed demands to their employers for owed wages; (2) AIG never contested timeliness when providing defense coverage to UTC and

5

its officers in the state court action, coverage which was subject to the same notice requirements as claims; and (3) AIG participated in the trial, settlements, and negotiations throughout that proceeding and thus "had actual notice" of their claims long before they allege here. *Id.* at 10-14. Further, they argue that the policy itself requires the insurer to base a denial of coverage on more than late notice alone and must show prejudice, which it cannot do. *Id.* at 10. Alleging that AIG deliberately waited until UTC was defunct so that it could avoid paying these claims, Defendants argue that AIG has unclean hands and is estopped and/or has waived any timeliness defense. *Id.*

Defendants then argue that coverage exists under both the EPL and D&O sections of the policy. They argue the EPL section covers their claims because they were fired in retaliation for asking for their backpay, as was litigated in state court, and the EPL section specifically covers "employment practices violations," including retaliation. *Id.* at 14-16. They assert that the EPL section covers the "employment-related misrepresentations" as to their owed backpay as well. *Id.* at 19. Defendants further argue that their retaliatory termination was a "wrongful act" as defined and covered by the D&O section. *Id.* at 22.

In opposition, AIG argues that the claim arose in April 2015 and not as a result of the May 2017 lawsuit because the language "arising from" in these coverage provisions means the lawsuit merely stemmed from the underlying demands for pay made in April 2015. R. Doc. 119 at 12-13. Therefore, because a claim cannot be first discovered twice, the 2015 date controls. AIG additionally refutes any characterization of retaliation, noting that the state court case only addressed breach of contract claims and Louisiana Wage Payment Act claims, never allegations of retaliatory termination. *Id.* at 21.

AIG's motion urges the Court to grant it summary judgment because the policies do not cover Defendants' losses and/or the state court judgment. R. Doc. 117. AIG presents four

arguments in its favor: (1) Defendants' claim was first made by email in April 2015 and was not reported to AIG until September 2017, more than 90 days after the 2015-2017 policy concluded and therefore there is no coverage under any policy; (2) a claim can only be "first made" once and therefore the 2015 date is the first-made date; (3) Defendants' owed pay stems from breaches of their employment contracts and the policies exclude coverage for breach of contract claims; and (4) the policies exclude coverage for claims based on payment of wages. R. Doc. 117-1 at 2-3.

AIG points to a number of the policy provisions to bolster their arguments. First, they argue the notice provisions require the claim to both be made <u>and</u> reported to AIG within the <u>same</u> policy period or within 90 days of the policy period's conclusion. *Id.* at 10-13. AIG takes the position that Defendants' claim was first made in April 2015 when Agee emailed his boss demanding their backpay. *Id.* at 10. The policy in effect at that time was the 2015-2017 policy, and AIG alleges that it received no notice from UTC until September 2017 when they received notice of the federal lawsuit. *Id.* at 12. Because that is more than 90 days after the policy period's conclusion on March 31, 2017, AIG argues there is no coverage. *Id.*

Next, AIG points to the D&O and EPL provisions that exclude breach of contract claims, noting that Defendants' ultimate claim is for a breach of their employment contracts setting forth their pay. *Id.* at 16-18. AIG then turns to the provisions in both D&O and EPL sections that exclude claims for losses based on unpaid wages and argue that this exclusion operates to bar coverage to Defendants. *Id.* at 18-20. Lastly, AIG argues that Defendants are not granted a right of direct action under Louisiana law against an insurer because their claims are fundamentally contractual disputes, and the Louisiana framework does not classify them as third-party beneficiaries of the insurance policies. *Id.* at 20-25.

In opposition, Defendants reiterate their position that the lawsuit filed in May 2017 constitutes its own separate claim under the policy's definition, and because May and September both fall within the policy period spanning March 2017 – March 2018, the notice requirement is satisfied. R. Doc. 121 at 5-6. In response to the wage exclusion argument, Defendants argue that the amounts they sought in state court may not be considered wages, because while they were paid their salaries, they were not paid bonuses and commissions which are more akin to profit sharing and therefore do not fall under the wage exclusion. *Id.* at 11-13.

### III. APPLICABLE LAW

#### a. Summary Judgment

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c*); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

#### b. Contract Interpretation and Burden

Louisiana law applies the general rules of contract interpretation to construe insurance policies. *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990). "The parties'

intent, as reflected by the words of the policy, determine the extent of coverage." *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1183 (La. 1994). "Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.* Where the language in the policy is clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written. *Ledbetter v. Concord Gen. Corp.*, 665 So.2d 1166, 1169 (La. 1996). Courts interpreting liability policies should interpret such policies "to effect, rather than to deny coverage" but "it is well-settled that unless a statute or public policy dictates otherwise, the insurers may limit liability and impose such reasonable conditions or limitations upon their insureds." *Supreme Services & Specialty Co., Inc. v. Sonny Greer, Inc.*, 958 So. 2d. 634, 638-39 (La. 2007). Further, when exclusionary provisions are unambiguous, they "must be given effect." *Id.* at 639.

In Louisiana, "[t]he burden rests with the insured to prove that an insurance policy covers a particular claim." *IberiaBank Corp. v. Illinois Union Insurance Co.*, 953 F.3d 339, 346 (5th Cir. 2020). However, the burden of proving the applicability of an exclusion rests with the insurer. *Jones v. Estate of Santiago*, 870 So. 2d 1002, 1010 (La. 2004)).

**c. Relevant Louisiana Insurance State Law Framework**

These motions argue over the meaning of specific provisions and exclusions and the parties disagree as to whether the bad faith and direct action statutes apply in this case. Accordingly, a brief overview of the state law framework and the court's treatment of these relevant provisions and exclusions is in order.

    i.    <u>Claims Made Policies</u>

First, the policies in this matter are claims-made policies. A claims-made policy "covers the insured only 'for claims made during the policy [period] … regardless of when the covered act

or omission occurred.'" *Matador Petroleum Corp. v. St. Paul Surplus Lines Insurance Co.*, 174 F.3d 653, 658 n.2 (5th Cir. 1999) (quoting *National Union Fire Insurance Co. v. Talcott*, 931 F.2d 166, 168 n.3 (1st Cir. 1991)). This is in contrast to an occurrence policy, which is triggered upon the occurrence of an act or omission, regardless of when it is reported to the insurer. *Id.* As a result, the time at which the insured brings the claim to the insurer's attention is highly relevant in claims-made policies, and an insured's compliance with the notice provisions of the policy are examined closely. *Id.* at 659 ("Courts strictly interpret notice provisions in a 'claims-made' policy.") (citing *FDIC v. Booth*, 82 F.3d 670, 678 (5th Cir. 1996)). Under Louisiana law, an insurer does not need to show prejudice when it seeks to enforce the notice requirement in a claims-made policy. *First American Title Insurance Co. v. Continental Casualty Co.*, 702 F.3d 1170, 1173-76 (5th Cir. 2013) (explaining that the purpose of the notice provision in claims-made policies is not to prevent prejudice to the insurer but rather to define the scope of coverage).

  ii. <u>Direct Action Statute & the Distinction Between Tort and Contract Claims</u>

Next, Louisiana's Direct Action Statute provides that "the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy." La. R.S. §22:1269(A). Such action may be brought by an "injured person or his survivors or heirs." *Id.* at 1269(B)(1). The Louisiana Supreme Court has observed that the Direct Action Statute "was enacted to give special rights of action to injured tort victims." *Arrow Trucking Co. v. Continental Insurance Co.*, 465 So. 2d 691, 700 (La. 1985); *Cacamo v. Liberty Mutual Fire Insurance Co.*, 764 So. 2d 41, 43 (La. 2000). While the statute provides relief in the form of "payment of damages for injuries," that the claim must "sound in tort has been liberally construed." La. R.S. §22:1269(A); 15 La. Civ. L. Treatise, Insurance Law &

Practice §2:10 (collecting cases where "it was argued that the claim might also or might only sound in contract" and courts permitted a direct action to proceed).

Courts acknowledge that claims may present multiple theories of recovery, some in tort and some in contract, and courts permit such cases to proceed under the Direct Action Statute. *Orleans Parish School Board v. Chubb Custom Insurance Co.*, 162 F. Supp. 2d 506, 515-16 (E.D. La. 2001) (Clement, J.) (citing *Champion v. Panel Era Manufacturing Co.*, 410 So. 2d 1230, 1235-36 (La. App. 3 Cir. 1982)). However, even if a claim sounds in tort, if it arises from a breach of contract, courts tend to find that the Direct Action Statute does not provide a cause of action. *Mentz Construction Services, Inc., v. Poche*, 97 So. 3d 273, 276-78 (La. App. 4 Cir. 2012). Courts determine whether an action is one in contract or one in tort by examining the nature of the underlying claim. *Certain Underwriters Lloyds London v. Sea-Lar Mgmt, Inc.*, 787 So. 2d 1069, 1074-76 (La. App. 4 Cir. 2001) ("The action on a contract flows from a breach of a special obligation, while an action in tort flows from the violation of a general duty.") (quoting *Ridge Oak Development, Inc. v. Murphy*, 641 So. 2d 586, 589 (La. App. 4 Cir. 1994)). Louisiana courts have described a contractual action as "ex contractu," one which stems from the breach of a contractual promise (implicit or explicit), and a tort action as "ex delicto," one which stems from a breach of "a general duty owed to all persons." *Davis v. Le Blanc*, 149 So. 2d 252, 254 (La. App. 3 Cir. 1963); *Mentz Construction Services, Inc.*, 97 So. 3d at 277-78 (discussing implicit promises in contracts).

One wrinkle under the facts of this case, compounded by its posture in the summary judgment stage, is that the claim here is arguably a lawsuit and the loss a state court judgment resulting from a Louisiana Wage Payment Act ("LWPA") action. It is thus necessary to examine whether a LWPA claim constitutes a claim in contract or a claim in statutory tort. Louisiana courts

11

have considered statutory penalties arising from breach of contract claims as contractual in nature, holding such claims to the contractual ten-year prescriptive period. For example, in *Wightman v. Ameritas Life Insurance Corp.*, the Louisiana Supreme Court addressed a question certified by the Fifth Circuit: "Are claims arising under Louisiana's Preferred Provider Organization Act, La. R.S. 40:2203.1, delictual or contractual for prescriptive purposes?" 351 So. 3d 690, 691 (La. 2022). The court held that, because those claims arise out of contracts, the contractual prescription period applies. *Id.* The court supported this decision by pointing to *Smith v. Citadel Insurance Co.*, discussed *infra*, as well as *DePhillips v. Hospital Service District No. 1 of Tangipahoa Parish*, 340 So. 3d 817, 821 (La. 2020). *Id.* at 695-96. In *DePhillips*, the court found that a violation of a statutory duty dealing with balance billing was delictual because "the healthcare provider had not contractually assumed either an express or implied obligation to forgo balance billing and the obligation not to balance-bill was a general one created by law." *Id.* at 396 (discussing *DePhillips*).

In determining whether a LWPA violation constitutes a contractual or delictual claim, the Court looks first to Louisiana jurisprudence on actions to recover unpaid wages and how courts treat such claims. Under Louisiana law, "an action for the recovery of compensation for services rendered is subject to a liberative prescription of three years." *Fishbein v. State ex rel. Louisiana State University Health Sciences Center*, 898 So. 2d 1260, 1266 (La. 2005); La. Civ. Code Ann. art. 3494(1). One appellate court discussed the interplay between an employment contract and a statutory wage claim, rejecting the plaintiff's claim that her contract date determined when she could pursue her claims. *Monroe v. Physicians Behavioral Hospital, LLC*, 147 So. 3d 787, 795 (La. App. 2 Cir. 2014) ("Monroe argues that her claims only became exigible when her contracts ended. However, her claims are for unpaid wages. These claims were exigible at the time the wages were earned and payment was due. At that point, Monroe could have complained about any alleged

underpayment of wages due her and could have asserted her claims."). *Monroe* does not discuss whether the claim for wages is contractual or delictual in nature, however the plaintiff's original petition in the matter asserted a breach of contract claim as to her employment contract. Petition at 2-3, Monroe v. Physicians Behavioral Hospital, LLC, No. 566700 (La. Dist. Ct. Mar. 6, 2013). Nevertheless, the court applied the statutory three-year prescriptive period and not the ten-year contractual prescriptive period to her claim, indicating that the wage claim controls over the breach of contract claim, at least for prescriptive purposes. *Monroe*, 147 So. 3d at 795.

The Louisiana Supreme Court confirms as much in *Grabert v. Iberia Parish School Board*, explaining that "[t]he nature of the claim (for under paid wages) is not something different because it arises out of a breach of contract." 638 So. 2d 645, 647 (La. 1994). In *Grabert*, the plaintiffs were Iberia Parish School Board employees who worked under four year employment contracts. *Id.* at 646. While their contracts did not stipulate the amount of wages, they sued "contend[ing] that the Board breached their respective contracts by paying them less than they were due under the appropriate salary index." *Id.* The trial court found that the three-year prescriptive period applied, and the appellate court reversed on the basis that the ten-year prescriptive period for personal actions, i.e. contract claims, applied. *Id.* The Supreme Court held that the three-year period applied, reasoning that the fact that there was a breach of contract did not change the underlying nature of the claim, which was one for unpaid wages. *Id.* at 647. The court reasoned that article 3499, which sets the ten-year prescriptive period for personal actions, is qualified by the language "[u]nless otherwise provided by law," and article 3494(1) indeed provides otherwise. Id. Further, the court rejected the plaintiffs' argument that their claims deal exclusively with rights in their employment contracts, stating "this argument is unpersuasive as virtually all claims for wages arise out of breach of contract, oral or written, to pay wages for services rendered." *Id.*

13

Ultimately, the jurisprudence does not clearly state whether a violation of the Louisiana Wage Payment Act constitutes an action in contract or in tort, and the Court is left to analogize to the foregoing approaches and infer from Louisiana courts' treatment of prescription.

During oral argument on October 19, 2023, the parties argued whether a violation of the LWPA constitutes a "statutory tort," analogizing as above to prescription. While there appears no case directly answering this inquiry, a federal district court in Texas addressing a FLSA claim adopted a Third Circuit characterization of statutory tort which distinguishes between "a claim asserting a violation of a personal injury tort or tort type right" from a claim asserting "an economic right arising out of contract." *Osborn v. Computer Sciences Corp.*, 2004 WL 5454227, at *6-7 (W.D. Tex. Oct. 25, 2004) (*quoting Byrne v. Commissioner*, 883 F.2d 211, 215 (3d Cir. 1989)). "This duty is independent of any duty an employer might owe his employee pursuant to an express or implied employment agreement; it arises by operation of law. Thus, the statutory claim seeks to remedy a statutory violation that the law has defined as wrongful." *Id.* (quoting *Byrne*, 883 F.2d at 215). Applying this logic, the LWPA arguably establishes a duty to pay wages, independent from an employment contract. While the contract may be helpful in determining the *amount* of wages owed, see *Monroe*, 147 So. 3d 787 (La. App. 2 Cir. 2013), courts appear to treat claims for wages as a violation of a statutory duty imposed by the LWPA and not as a breach of contract.

    iii.    <u>Bad Faith Statute</u>

Finally, Louisiana's insurance bad faith statute permits an action against an insurer in certain circumstances. The relevant language of La. R.S. § 22:1973 is:

> A. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

> B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A of this Section:
> . . .
>> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

The Louisiana Supreme Court has held that third party claimants may in fact have a direct action under Louisiana's good faith duty statute, noting the inclusion in Subsection A of both "the insured" and "claimant." *Theriot v. Midland Risk Insurance Co.*, 694 So. 2d 184, 188 (La. 1997) ("Had the legislature meant to address only the rights of 'insureds,' it would have been unnecessary to use the phrase 'insured or claimants' in the act."). Importantly, the *Theriot* court held that only the enumerated rights of action in the statute are available to third-party claimants; that right is not without limit. *Id.* at 193. However, the Court of Appeal of Louisiana, Fifth Circuit held just the next year that *Theriot*'s language about claimants' rights was *dicta*, and subsequently reversed a judgment awarding the plaintiff penalties, holding that (B)(5) "*does not* provide a right of action to third-party claimants." *Paul v. Allstate Insurance Co.*, 720 So. 2d 1251, 1255-56 (La. App. 5 Cir. 1998), *writ denied*, 735 So. 2d 640 (La. 1999). *Paul* would imply that a third party's bad faith counterclaim is not permitted under La. R.S. § 22:1973(B)(5), but there exists a plausible argument otherwise, in reliance on *Theriot*.

The Louisiana Supreme Court has explained that violations of the bad faith statute tend to be contractual claims, at least when asserted by the insured. *Smith v. Citadel Insurance Co.*, 285 So. 3d 1062, 1068-69 (La. 2019) (addressing whether the contractual or delictual prescription period applies to bad faith claims). The court reasoned that "[i]n the absence of a contractual obligation, the duty of good faith does not exist," and therefore an insured bringing a bad faith claim against its insurer brings a claim in contract. *Id.* However, when addressing third party claimants bringing a bad faith claim, the court noted that no such contractual relationship exists

15

between a third party claimant and an insurer, implying that such a claim would instead be delictual. *Id.* at 1072. Importantly, the court distinguishes *Smith* from *Zidan v. USAA Property and Casulaty Insurance Co.*, 622 So. 2d 265 (La. App. 1 Cir. 1993), which held a plaintiff asserting a bad faith claim to a one-year (delictual) prescription period. *Smith*, 285 So. 3d at 1072. The *Smith* court finds the distinguishing factor to be that "*Zidan* involved a bad faith claim asserted by a third party, not the insured." *Id.*

## IV. DISCUSSION

The Court grounds its discussion in the standard for summary judgment, which requires that there be "no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Following a review of the law, briefings, and oral argument, the Court finds a number of factual questions unresolved such that summary judgment is not appropriate at this juncture. For example, the intent of the parties in 2015 is unclear, vague, and therefore a dispute of a material fact. Agee and Harrelson aver that their intent in sending the April 2015 email to their former employers was not that it constitutes a "written demand" but rather that it was a proposal for a resolution. AIG on the other hand argues that they demanded, in writing, their payment owed, and therefore that constitutes a "claim." The Court asked the parties during oral argument whether UTC Laboratories, if it had intended to pay the claim upon receipt of that email, was required to report the email as a "claim" to its insurer. AIG answered that if UTC wanted to secure coverage, then it had to report the claim. The Court however finds this response vague because if UTC did not consider this a "claim," that is, if UTC intended to pay once it rearranged its financials, then it would have no reason to report this as a "claim," no reason to believe it required coverage. A fact

finder could reasonably believe that this in fact did not constitute a claim and therefore UTC did not need to report it to AIG. Alternatively, a reasonable fact finder could conclude the opposite. Because this issue underpins much of the parties' arguments about the applicability of coverage, summary judgment is inappropriate at this time.

Additionally, the Court finds the question of what AIG knew and when as it pertains to the state court suit too factually pregnant to warrant a conclusive finding on waiver of notice. Summary judgment requires evidence be viewed in a light most favorable to the nonmovant and in both cases here, there exists enough factual and evidentiary ambiguity for a reasonable fact finder to find in favor of or against either party. For example, AIG certainly had actual notice of the existence of Agee and Harrelson's situation and their pursuit of recovery from UTC, as they were involved (albeit not as a named party) in the state court litigation by virtue of providing defense costs and participating in settlements and mediations. Whether this can constitute waiver or estoppel however, though implicating questions of law, also raise questions of fact, specifically as to whether Agee and Harrelson could have, or should have, added AIG to the suit, or whether AIG's monitoring of the suit was enough to (mis)represent to them that AIG would step into UTC's shoes following its insolvency.

The Court acknowledges that the law is not perfectly clear as to whether Agee and Harrelson can bring their counterclaim under the Direct Action Statute and Bad Faith Statute, but, pursuant to the foregoing analysis, holds both are permissible.

Accordingly, the Court denies both AIG's and Agee and Harrelson's motions for summary judgment.

New Orleans, Louisiana, this 2nd day of November, 2023.

_____
United States District Judge