UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **AIG SPECIALTY INSURANCE COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-5410** |
| **JAMES AGEE, ET AL** | **SECTION "L" (2)** |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

This case stems from an employment dispute among James Agee ("Agee") and Shea Harrelson ("Harrelson") (collectively, in this case, "Defendants") and their former employer UTC Laboratories LLC ("UTC"). Defendants both began working for UTC on July 1, 2014 as Area Vice Presidents with identical employment contracts. Their employment contracts provided that they were to be paid base salaries of $10,000 per month, plus monthly commissions, and quarterly bonuses. Defendants allege they were paid accordingly until November 2014 when UTC began to pay them only their monthly base salaries and finally in April 2015 terminated both Defendants employment. Defendants brought suit against UTC in the Eastern District of Louisiana in 2017 for earned compensation, bonuses, commissions, paid time off, and other fringe benefits and severance that they allege they never received. That federal suit was dismissed without prejudice in early 2018 because there was no longer diversity among the parties. However, in October of 2017, Agee and Harrelson also filed a state lawsuit against UTC in the 24th Judicial District Court of Jefferson Parish Louisiana. The State suit proceeded to trial in October 2022 and on December 19, 2022 the State court Judge signed a judgment in favor of Agee and Harrelson and against UTC awarding Agee $1,110,373.34 and awarding Harrelson $2,125,537.35. UTC has declared bankruptcy and is now defunct. AIG Specialty is the insurer of UTC.

1

The present case before this Court involves a declaratory judgment brought by AIG Specialty against Defendants Agee and Harrelson. AIG Specialty seeks a declaratory judgment asserting: (1) failure of notice; (2) no duty or obligation under any policy to indemnify, pay or reimburse UTC and or other claimants with respect to the State court judgment and (3) limitations and exclusions under the policies. Defendants Agee and Harrelson generally deny AIG Specialty's allegations, assert a number of affirmative defenses, and bring a counterclaim against AIG Specialty for payment of the State court judgment.  The court found as a matter of law that the disputed provisions and terms of the policies were vague and dependent on the intent of the parties and that the counterclaim is dependent on disputed facts. These conflicting positions raise questions of fact which must be resolved by a trial. Accordingly, this case came on for trial before the Court without a jury on December 4th and 5th, 2023.  The Court has carefully considered the testimony of all witnesses, the exhibits entered into evidence during the trial, and the relevant entries in the record, and, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact may be construed a conclusion of law the Court adopts it as such. To the extent that any conclusion of law constitutes a finding of fact the Court adopts it as such.

## FINDINGS OF FACT

**A. The Parties and Relevant Entities**

1. According to the online records of the Louisiana Secretary of State, UTC Laboratories, LLC ("UTC") registered as a Louisiana limited liability company on June 21, 2012 and was issued Charter No. 40868722K.

2. UTC was also known and did business as "Renaissance RX" and "Ren RX."

3. UTC's members and managers included Barry Griffith ("Griffith"), Tarun Jolly, MD ("Jolly"), and Patrick Ridgeway ("Ridgeway"), also referred to as UTC's owners.

4. AIG Specialty is an insurance company organized and existing under the laws of the State of Illinois with its principal place of business in New York and is authorized to do certain business as an insurance company in the State of Louisiana.

5. AIG Specialty Policy No. 09-706-31-07 has a Policy Period from March 31, 2015 to March 31, 2017 and ECF No. 117-2 is a copy of that policy ("2015-2017 Policy").[1]

6. AIG Specialty Policy No. 01-308-60-68 has a Policy Period from March 31, 2017 to March 31, 2018 and ECF No. 117-3 is a copy of that policy ("2017-2018 Policy").[2]

7. AIG Specialty Policy No. 01-309-86-42 has a Policy Period from March 31, 2018 to March 31, 2020 and ECF No. 117-4 is a copy of that policy ("2018-2020 Policy").[3]

8. Each policy includes Declaration Pages, General Terms and Conditions, a Directors, Officers and Private Company Liability Section ("D&O Coverage Section" or "D&O Coverage"), Employment Practices Liability Insurance ("EPL Coverage Section" or "EPL Coverage"), Appendices, and Endorsements.

9. Each policy includes Program Participants Endorsements in endorsements attached to each policy.

10. Each policy identically defines the terms Named Entity and Program Participants Endorsements.

11. Each policy also includes a Program Participant Endorsement that lists and includes UTC as a Named Entity, subject to the terms and conditions thereof.

---

[1] Joint Exhibit 1 (2015-2017 AIG Specialty Policy labeled as AIGS.001421-001637).
[2] Joint Exhibit 2 (2017-2018 AIG Specialty Policy labeled as AIGS.001421-001637).
[3] R. Doc. 117-4 (2018-2020 AIG Specialty Policy labeled as AIGS.001638-002051).

12. Each policy identically defines the term Claim.

13. James Agee resides and is domiciled in the State of Arizona.

14. Shea Harrelson resides and is domiciled in the State of South Carolina.

15. In 2013, Agee and Harrelson began working with UTC as independent contractors and were to be issued Internal Revenue Service Form 1099 documents for any income received from UTC.

16. On or about July 14, 2014, Agee and Harrelson each signed a separate Employment Agreement with UTC, with an effective date of July 1, 2014.[4]

**B. The Underlying Dispute**

17. In 2013-2014, UTC's business included marketing and soliciting referrals for individuals to undergo pharmacogenomics, toxicology, urine, saliva, and other laboratory testing and then billing and collecting from third party payors for the charges for such testing.

18. Pharmacogenomics involves a laboratory test that determines how an individual processes medications based on that individual's own metabolism.

19. In July 2014, based on their respective Employment Agreements, each Defendant, Agee and Harrelson, became a UTC employee, was designated as an Area Vice President ("AVP") and was to be issued Internal Revenue Service Form W-2 documents for any income received from UTC.

20. In accordance with Section 3.01 and Exhibit A of the separate Employment Agreements, UTC agreed to pay Defendants compensation, bonuses and allowances as follows: a base salary, commissions, and a bonus that corresponded to the quarterly profitability of an

---

[4] Joint Exhibit 3 (July 1, 2014 Employment Agreement between Agee and UTC labeled as UTC_000001-000077); and Joint Exhibit 4 (July 1, 2014 Employment Agreement between Harrelson and UTC labeled as UTC_000119-000143).

4

AVP's area, and a maximum monthly expense of $10,000 and a monthly car allowance of $600.[5]

21. Defendants' compensation included their monthly commissions and quarterly bonuses, which were based off of sales collections and the amount of revenue that was collected for each AVP's geographic area.

22. UTC was supposed to pay Defendants' accrued or earned monthly commissions in the following month and quarterly bonuses in the following quarter, after a period for reconciliation and accounting.

23. If UTC terminated Defendants without cause, Defendants' Employment Agreements with UTC also required UTC to continue paying Defendants severance pay based upon tests received by the labs for those accounts through June 30, 2015, which would have been paid as quarterly bonuses otherwise.[6]

24. In the latter part of November 2014, Defendants learned from UTC that Medicare, UTC's principal source of revenues, had suspended making any payments to UTC due to its pending audit and investigation of UTC's billing and other practices.

25. Following Medicare's suspension of payments, UTC's referrals and sales for pharmacogenomic testing fell off precipitously and were reported to have caused financial difficulties for UTC.

26. In late November 2014, UTC advised Defendants that UTC was in financial trouble and requested that each Defendant agree to temporarily defer being paid their quarterly bonus due for the Third Quarter of 2014.

---

[5] *Id.*
[6] *Id.*

27. Defendants agreed to temporarily defer being paid their quarterly bonus for the Third Quarter of 2014 but did not agree to defer all subsequent bonuses that became due.

28. UTC paid Agee and Harrelson their base salary through their termination on April 3, 2015.

29. In an email from Barry Griffith dated January 8, 2015, UTC agreed to pay Defendants and others "all owed commissions + 15% per annum interest over the next 5 months."[7]

30. On March 26, 2015, Barry Griffith sent an email on which Defendants were copied that stated in part as follows: "[I]t has become necessary that we temporarily delay issuing commission payments until long overdue Medicare funds are secured," which Shea Harrelson believed meant that "now they [UTC] are saying, [w]ell, until Medicare pays us, we're not going to pay you."[8]

31. On April 3, 2015, UTC terminated Defendants' employment without cause, which entitled Defendants to be paid compensation based on all revenue that UTC received for tests that Defendants had ordered through June 30, 2015.

32. Since their termination on April 3, 2015, Agee and Harrelson both confirmed that they "have made numerous amicable demands that have not resulted in any payment to plaintiffs for any amounts owed."

33. On April 18, 2015, Agee sent an email to UTC's owner Griffith, Jolly, and Ridgeway on his behalf and on behalf of Harrelson and another Area Vice President, Danny Hillhouse, acting as their spokesperson.

34. Agee's April 18, 2015 email followed discussions between Griffith, Jolly, and Ridgeway and Defendants and Danny Hillhouse after their termination on April 3, 2015, during which

---

[7] Joint Exhibit 6 (January 8, 2015 email from Barry Griffith to Patrick Ridgeway et al. UTC_055448).
[8] Joint Exhibit 12 (March 26, 2015 email from Barry Griffith to Patrick Ridgeway with copies to Shea Harrelson, Danny Hillhouse and Jay Agee labeled as UTC_093688).

Defendants discussed UTC paying monies to satisfy Defendants' monthly commissions and quarterly bonuses.[9]

35. UTC did not pay any quarterly bonus due or payable to any Defendants with respect to the Third Quarter 2014 or any quarter through June 30, 2015, for the work and services that each Defendant performed or provided in accordance with those Agreements.

36. In late March or early April 2017, Agee and Harrelson began discussing retaining counsel to file a lawsuit and thereafter engaged Adam G. Young and his law firm as their counsel.

37. On April 12, 2017, Defendants' counsel Adam G. Young sent a letter to UTC's General Counsel Brandy Sheely to advise UTC of his law firm's representation of Defendants "regarding their claims against UTC Laboratories, LLC for unpaid employee compensation."[10]

38. Mr. Young's April 12, 2017 letter to UTC further stated that "[t]hese claims present a cause of action under La. R.S. 23:631 *et seq.*" and that "Ms. Harrelson and Mr. Agee hereby demand payment pursuant these and any other applicable laws."[11]

39. On April 13, 2017, on behalf of Defendant James Agee, Defendants' counsel Adam G. Young sent a letter to UTC's General Counsel Brandy Sheely that states:

> As you requested, and pursuant to my earlier demand, Mr. Agee is owed $377,346 in unpaid wages and other compensation earned from the third quarter of 2014 through April 2015.
>
> Mr. Agee has already made amicable demand in writing, so this correspondence should not be construed as his first demand for the purpose of calculating penalty wages or any other penalty. Mr. Agee reserves all rights he may have to further compensation based upon information that is not

---

[9] Joint Exhibit 4 (April 18, 2015 email from James Agee to Tarun Jolly, Patrick Ridgeway, Barry Griffith, Shea Harrelson, and Danny Hillhouse UTC_095644-095645).
[10] Joint Exhibit 24 (April 12, 2017 letter from Adam G. Young as counsel for Jay Agee and Shea Harrelson to Brandy Sheely of UTC Laboratories, LLC).
[11] *Id.*

known to him as of present writing, including but not limited to collections or proceeds from UTC's recent settlement with Vantari Genetics.[12]

40. On April 13, 2017, on behalf of Defendant Shea Harrelson, Defendants' counsel Adam G. Young sent a letter to UTC's General Counsel Brandy Sheely that states:

   As you requested, and pursuant to my earlier demand, Ms. Harrelson is owed $738,840 in unpaid wages and other compensation earned from the third quarter of 2014 through February 2015.

   Ms. Harrelson has already made amicable demand in writing, so this correspondence should not be construed as her first demand for the purpose of calculating penalty wages or any other penalty. Ms. Harrelson reserves all other claims and rights she may have to further compensation based upon information that is not known to her as of present writing, including but not limited to collections or proceeds from UTC's recent settlement with Vantari Genetics.[13]

41. On May 6, 2017, Defendants filed a Complaint ("Federal Court Complaint") against UTC in the United States District Court for the Eastern District of Louisiana, Civil Action No. 2:17-cv-04755-JTM-KWR, which was later dismissed without prejudice and may be referred to as the "Federal Lawsuit."[14]

42. On October 17, 2017, Defendants filed a Petition for Damages, Penalty Wages and Attorney's Fees ("24th JDC Petition") in the Twenty-Fourth Judicial District Court for the Parish of Jefferson Parish, State of Louisiana, bearing Docket No. Docket No. 776,917, Division A, which may be referred to herein as the "24th JDC Lawsuit," a copy of which was forwarded to AIG Specialty by an email dated October 23, 2017.

---

[12] Joint Exhibit 25 (April 13, 2017 letter from Adam G. Young as counsel for Shea Harrelson to Brandy Sheely of UTC Laboratories, LLC).
[13] Joint Exhibit 26 (April 13, 2017 letter from Adam G. Young as counsel for Jay Agee to Brandy Sheely of UTC Laboratories, LLC).
[14] Joint Exhibit 27 (September 19, 2017 email from Anthony Dragone of Willis Towers Watson to AIG's c-Claim In Box, with the attached Federal Lawsuit labeled as AIGS.000028-000033).

43. AIG Specialty was never named or added as a party in the Federal Court Lawsuit or in the 24th JDC Lawsuit.

44. AIG Specialty was, however, aware of the 24th JDC Lawsuit, was present at times for that litigation, funded UTC's defense costs, and was a party to various settlements that resulted from this lawsuit.

45. Agee and Harrelson had no knowledge of any insurance coverage being potentially available until after the litigation was filed on their behalf.

46. On September 16, 2022, the District Judge in the 24th JDC Lawsuit rendered a Judgment granting Agee and Harrelson's Motion for Partial Summary Judgment against UTC, stating: "UTC Laboratories LLC is hereby found liable for breach of contract, namely the Plaintiffs' Employment Agreement, and for violations of the Louisiana Wage Payment Act, La. R.S. §23:631 *et seq.* leaving for trial the remaining issues of quantum, penalty wages, attorneys' fees and costs."[15]

47. On December 19, 2022, the District Judge in the 24th JDC Lawsuit rendered a Judgment in favor of Defendants Agee and Harrelson and against UTC, which awarded each Defendant the following amounts for Unpaid Bonuses/Commissions, Penalty Wages (Based on Salary only), Vantari & Ally Commissions, Attorneys' Fees and Costs, together with legal interest as described in that Judgment: Agee $1,110,373.34; Harrelson $2,125,537.35[16]

---

[15] Joint Exhibit 33 (September 16, 2022 Judgment rendered in the 24th JDC Lawsuit granting UTC's and Harrelson's Motion for Partial Summary Judgment and limiting against Agee and Harrelson's claims for penalty damages for their LWPA claims).

[16] Joint Exhibit 35 (December 19, 2022 Judgment rendered in favor of Agee and Harrelson and against UTC Laboratories, L.L.C. in the 24th JDC Lawsuit).

48. Plaintiff AIG Specialty, the insurer of the bankrupt employer, seeks a declaratory judgment that it does not owe the amounts awarded to Agee and Harrelson.

## **CONCLUSIONS OF LAW**

### I.  Jurisdiction

1. This case arises under the Court's diversity jurisdiction, 28 U.S.C. § 1332, because there exists complete diversity of citizenship between Plaintiff AIG Specialty and each Defendant, and the amount in controversy between Plaintiff and Defendants exceeds the sum or value of $75,000, exclusive of interest and costs. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391.

### II.  Contract Interpretation Principles

2. Louisiana law applies the general rules of contract interpretation to construe insurance policies. *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990).

3. "The parties' intent, as reflected by the words of the policy, determine the extent of coverage." *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1183 (La. 1994). "Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.*

4. Where the language in the policy is clear, unambiguous, and expressive of the intent of the parties, the agreement must be enforced as written. *Ledbetter v. Concord Gen. Corp.*, 665 So.2d 1166, 1169 (La. 1996).

5. Courts interpreting liability policies should interpret such policies "to effect, rather than to deny coverage" but "it is well-settled that unless a statute or public policy dictates otherwise, the insurers may limit liability and impose such reasonable conditions or

limitations upon their insureds." *Supreme Services & Specialty Co., Inc. v. Sonny Greer, Inc.*, 958 So. 2d. 634, 638-39 (La. 2007).

6. When exclusionary provisions are unambiguous, they "must be given effect." *Id.* at 639.

7. In Louisiana, "[t]he burden rests with the insured to prove that an insurance policy covers a particular claim." *IberiaBank Corp. v. Illinois Union Insurance Co.*, 953 F.3d 339, 346 (5th Cir. 2020).

8. The burden of proving the applicability of an exclusion rests with the insurer. *Jones v. Estate of Santiago*, 870 So. 2d 1002, 1010 (La. 2004)).

### III.   Claims-Made Policies

9. A claims-made policy "covers the insured only 'for claims made during the policy [period] … regardless of when the covered act or omission occurred.'" *Matador Petroleum Corp. v. St. Paul Surplus Lines Insurance Co.*, 174 F.3d 653, 658 n.2 (5th Cir. 1999) (quoting *National Union Fire Insurance Co. v. Talcott*, 931 F.2d 166, 168 n.3 (1st Cir. 1991)). This is in contrast to an occurrence policy, which is triggered upon the occurrence of an act or omission, regardless of when it is reported to the insurer. *Id.*

10. The time at which the insured brings the claim to the insurer's attention is highly relevant in claims-made policies, and an insured's compliance with the notice provisions of the policy are examined closely. *Id.* at 659 ("Courts strictly interpret notice provisions in a 'claims-made' policy.") (citing *FDIC v. Booth*, 82 F.3d 670, 678 (5th Cir. 1996)).

11. Under Louisiana law, an insurer does not need to show prejudice when it seeks to enforce the notice requirement in a claims-made policy. *First American Title Insurance Co. v. Continental Casualty Co.*, 702 F.3d 1170, 1173-76 (5th Cir. 2013) (explaining that the

purpose of the notice provision in claims-made policies is not to prevent prejudice to the insurer but rather to define the scope of coverage).

## COVERAGE FOR A CLAIM

1. For there to be coverage for the State Court Judgment under any policy, the Judgment must constitute a Loss as defined by a policy section. Defendants allege that two sections, the Directors, Officers and Private Company Liability Insurance (D&O) Section and the Employment Practices Liability Insurance (EPL) Section, each independently provide coverage for the Judgment. The D&O Section provides coverage for certain claims against individual insureds, such as directors and officers of the insured company, as well as the insured company itself. The EPL Section provides coverage for claims against the insured company for alleged and actual employment-related violations or wrongful acts as defined by the policy.

2. The D&O Section provides coverage for the "Loss of the Company arising from a: (i) Claim made against the Company." The EPL Section provides coverage for the "Loss of an Insured arising from a claim first made against such Insured for any Wrongful Act."[17] Therefore, for coverage to exist, the Judgment must constitute a Claim for Loss as defined by these policy sections.

3. A Claim is defined in each policy's General Terms and Conditions as "(i) any written demand for monetary or non-monetary or injunctive relief (including, but not limited to, any request to toll or waive any statute of limitations); (ii) any civil, criminal, administrative or regulatory proceeding or arbitration, mediation or other dispute

---

[17] Company is defined as "the Named Entity and any Subsidiary thereof" and Insured is defined as "an Individual Insured" or "a Company." In this case, the parties treat both terms as referring to UTC and the Court does the same.

12

resolution proceeding for monetary or non-monetary or injunctive relief which is commenced by: (1) service of a complaint, motion, writ or similar pleading or service of an order…"[18]

4. The D&O and EPL Sections each define Loss to include "damages, judgments, settlements, [and] pre-judgment and post-judgment interest." The definitions of Loss continue, but the parties do not dispute that the Judgment is facially included in the definition, so for the purpose of this litigation, the Court accepts that this Judgment constitutes a Loss under both the D&O and EPL Sections of all policies.

5. The parties do dispute, however, whether a valid Claim exists. AIG Specialty relies on the notice and reporting provisions which set forth how UTC must notify its insurer of potential claims. Because the policies at issue are claims-made policies, a claim must be both first made and first reported by the insured, UTC, to the insurer, AIG Specialty, within the policy period or within ninety days after the policy period has concluded.

6. AIG Specialty argued that Agee's email to Griffith, Jolly, and Ridgeway on April 18, 2015 constituted a Claim because it was a "demand for monetary relief" and thus this Claim was first made on that date, within the March 31, 2015 – March 31, 2017 policy period. Accordingly, AIG Specialty argued, UTC must report that Claim to AIG Specialty before June 30, 2017 for coverage to exist under the 2015-2017 policy. AIG Specialty further argued that a Claim cannot be "first made" twice, so any attempt to report this Claim after June 30, 2017 would not create coverage under this, or a separate, policy.

7. Agee and Harrelson argued that this email does not constitute a Claim because this email was not a demand but rather an attempt to amicably settle the outstanding payments. Instead, they argue that the Claim that affords them coverage is the filing of their First Federal Lawsuit on May 6,

---

[18] The definition of Claim continues but for the purpose of this litigation, these are the only two definition portions that are relevant and argued by the parties.

2017, as this was a civil proceeding commenced by the filing of a complaint. In September 2017, UTC notified AIG Specialty of this federal lawsuit by email. Agee and Harrelson argue that this lawsuit did not exist prior to May 2017 and therefore it could not be "first made" at any earlier time, and that because this claim was both first made and first reported to AIG Specialty within the March 31, 2017 – March 31, 2018 policy period, coverage exists under that policy.

8. AIG Specialty argues that the lawsuit arises from the same set of facts as the April 18, 2015 email and therefore the Claim was first made to UTC in April 2015, first reported to AIG Specialty in September 2017, and therefore no coverage exists as it was not both first made and first reported within the same policy period.

9. Agee and Harrelson distinguish this email from the State Court Lawsuit because, in this April 18, 2015 email, they offer to forego the relief that was awarded to them in the Judgment – the Profit and Loss (P/L) Bonuses. *See* Joint Exhibit 14 ("I personally would agree to no payment on the P and L if we settle on the agreed amounts below.").

10. The Court must therefore decide whether the Claim underlying this litigation was the April 18, 2015 email or the First Federal Lawsuit filed May 6, 2017.

11. The Court heard testimony from AIG Specialty's corporate representative at trial who, when asked whether UTC needed to report the April 18, 2015 email to its insurer, stated that it would have been "best practice" to report it.

12. Tarun Jolly, UTC's manager, testified at trial by deposition and when asked about how UTC interpreted this April 18, 2015 email, testified as follows: "The question was: Did we have every intent to go and pay what was owed if the amount was positive? And the answer is yes." Jolly Depo. Transcript, 80:7 – 80:9.

13. When asked about his various email exchanges with Agee, Jolly testified as follows:

> Q: Okay. So if I understand this correctly, from April 2015, after my clients had been terminated through the e-mail exchanges with you through March of 2017, there were two aspects of what was going on. One

> was determining whether or not UTC owed them – owed Jay and Shea money at all, correct?
> A: Yes
> Q: And two, assuming that amount was positive, you – UTC intended to pay when it had the funds to do so?
> A: Correct.
>
> *Id.* at 84:1 – 84:12.

14. The Court finds that, based on the available evidence, UTC did not interpret these emails as a claim under the policy such that it would require reporting because UTC intended to pay it. It was simply an accounting of the amount of money owed by UTC. It only became a claim when the request could not be satisfied and a claim was formally made in the form of a lawsuit. It is clear that UTC was in financial distress at this time and that Jolly knew this, but he believed the distress was temporary and that matters would improve. In fact, he testified as follows:

   > Q: Thank you. Okay. Let's see. When you were asked about the statement by Mr. Fagan on your e-mails where you said later this exchange with Jay Agee that you said, "I promise the second we turn the corner, we are happy to work something out." What did that mean?
   > A: That whenever we started getting paid or started making any kind of profitability of the business, that we would figure out some sort of recompensation over there for what, if anything, was owed.
   >
   > *Id.* at 83: 14 – 83:25.

15. The Court is inclined to believe Jolly when he testifies that he and UTC's management were attempting to work out a resolution in earnest and that they did not believe this was a claim as contemplated under the policy which needed reporting until they were given notice of the lawsuit.

16. Even AIG Specialty considered the lawsuit as the first claim since they participated or were present during the state court trial and supported UTC's defense and various settlements with Agee and Harrelson.

15

17. Accordingly, on the question of whether the claim was both first made and first reported, the Court finds that the claim in question is the lawsuit, and that it was both first made and first reported within the policy period captured by the 2017-2018 policy. The Court thus does not reach the questions of waiver and estoppel.

## EXCLUSIONS FROM COVERAGE

1. Having established coverage exists under the 2017-2018 policy, the Court must now determine whether there are applicable exclusions from coverage that apply. AIG Specialty argued that two exclusions bar coverage for the State Court Judgment: (1) the wage exclusion and (2) the breach of contract exclusion. Both the D&O and EPL Sections contain these two exclusions. The primary difference between the exclusions contained in each Section are whether there are applicable exceptions (or "carvebacks") that render them inapplicable. Because the Court finds that the breach of contract exclusion operates to bar coverage, it does not reach the wage exclusion.

2. The breach of contract exclusion contained in the D&O Section of the 2017-2018 policy reads as follows:

> Solely with respect to this D&O Coverage Section, the Insurer shall not be liable to make any payment for Loss, in connection with the portion of any Claim made against an Insured: …
> (p) with respect to Coverage B(i)[19] only: …
>   (ii) for any actual or alleged contractual liability of the Company under any express written contract or agreement; *provided, however*, this exclusion shall not apply to any:
>     (1) Written Sale Agreement;
>     (2) Contract Claim Defense Costs Coverage;
>     (3) Securities Claim; or

---

[19] Coverage B(i) refers to suits against the Company as opposed to an Individual Insured.

16

> (4) liability which would have attached in the absence of such express contract or agreement.[20]

3. The breach of contract exclusion contained in the EPL Section of the 2017-2018 policy reads as follows:

> Solely with respect to this EPL Coverage Section, the Insurer shall not be liable to make any payment for Loss, in connection with a Claim made against an Insured: …
> (h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company under any express contract or agreement (other than any employee handbooks or human resources policies and procedures, or any organizational or management advisory documents of any Named Entity); provided, however, this exclusion shall not apply to:
> > (i) liability which would have attached in the absence of such express contract or agreement; or
> > (ii) Defense Costs.[21]

4. The employment agreements Agee and Harrelson signed create contractual liability on the Company's part. The State Court Judgment constitutes a Loss in connection with a Claim made against UTC, an Insured. Therefore, this exclusion in both Sections operates to bar coverage for the State Court Judgment. The only exception that could apply to bring the State Court Judgment back within the realm of coverage is the carveback, present in both Sections, as to "liability which would have attached in the absence of such express contract or agreement."

---

[20] Joint Exhibit 2 at AIGS.000284, AIGS.000291.
[21] *Id.* at AIGS.000304, AIGS.000306.

5. In its Order & Reasons dated November 2, 2023, this Court addressed whether a claim under the LWPA constitutes a claim in contract or a claim in tort for the purposes of interpreting Louisiana's Direct Action Statute. This Court stated:

    > Applying this logic, the LWPA arguably establishes a duty to pay wages, independent from an employment contract. While the contract may be helpful in determining the *amount* of wages owed, see *Monroe*, 147 So. 3d 787 (La. App. 2 Cir. 2013), courts appear to treat claims for wages as a violation of a statutory duty imposed by the LWPA and not as a breach of contract.[22]

6. In that context, the Court was responding to whether a cause of action is one in tort or in contract because the Direct Action Statute was enacted to give certain rights to victims of torts. In addressing whether Agee and Harrelson were entitled to bring a direct action suit against AIG Specialty, Agee and Harrelson argued in a hearing before the Court that a violation of the LWPA sounds in tort and thus authorized their suit. The Court agreed to permit the suit at that time.

7. The Court now having the benefit of a trial on the merits and post-trial briefing finds that, pursuant to the language of the policy and its exclusions, the liability at issue in the State Court Judgment arises from the contractual liability under Agee and Harrelson's employment agreements, which set forth their entitlement to certain commissions and bonuses that make up the State Court Judgment award. Absent the employment agreements, no liability would attach to UTC. Accordingly, the carveback is inapplicable and does not bring the State Court Judgment back under coverage.

---

[22] R. Doc. 140 at 14.

8. The Court accordingly must find that the 2017-2018 policy does not provide coverage for the State Court Judgment because the breach of contract exclusions contained in both the D&O and EPL Sections apply and judgment must be entered for AIG Specialty.

New Orleans, Louisiana, this 26th day of January, 2024.

_____
United States District Judge